## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CASE NO.: 18-CV-10050-RGS

UNITED STATES OF AMERICA *ex rel.*    )
REBECCA SOCOL, and REBECCA SOCOL,    )
individually,                        )
                                     )
                  Plaintiffs,        )
                                     )        **FILED UNDER**
vs.                                  )        **SEAL PURSUANT**
                                     )        **TO 31 USC**
KALÉO, INC., a Virginia corporation; )        **§ 3730(b)(2)**
ASEMBIA, LLC, a New Jersey company;  )
MEDEX HEALTH GROUP, LLC, a Virginia company, )
d/b/a Royal Care Pharmacy; BERKLEY PHARMACY, )
LLC, a Michigan company: SOLERA SPECIALTY )
PHARMACY, LLC, a Florida company; STAR )
DISCOUNT PHARMACY, INC., an Alabama corporation;)
EHT PHARMACY, LLC, a New Jersey Company, d/b/a )
Curexa; SUCCESSWARE, LLC, a Utah company, d/b/a )
The Pharmacie; PLYMOUTH TOWNE CARE )
 PHARMACY, INC., an Indiana Corporation d/b/a )
People's Drug Store; AVELLA, LLC, an Arizona )
 company; GIANT GENIE PHARMACY, LLC, a North )
Carolina Company; PATIENT RX SOLUTIONS )
PHARMACY, LLC, a Florida foreign limited liability )
company; PHYSICIAN PARTNERS OF AMERICA, LLC,)
a Florida foreign limited liability company; RX CARE )
FOUR, LLC, a Florida company, d/b/a BENZER )
PHARMACY 116; and BENZER PHARMACY )
HOLDING, LLC, a Florida company.     )
                                     )
                  Defendants.        )
_____/

## AMENDED COMPLAINT

1.    Plaintiff and Relator, Rebecca Socol ("Relator"), brings this civil False Claims Act

action to recover damages and civil penalties on behalf of the United States of America and herself

against kalèo, Inc., Asembia, LLC, MedEx Health Group, LLC, d/b/a Royal Care Pharmacy,

Berkley Pharmacy, LLC, Solera Specialty Pharmacy, LLC, Star Discount Pharmacy, Inc., EHT Pharmacy, LLC, d/b/a Curexa; Successware, LLC, d/b/a The Pharmacie; Plymouth Towne Care Pharmacy, Inc., d/b/a People's Drug Store; Avella, LLC; Giant Genie Pharmacy, LLC; Patient Rx Solutions Pharmacy, LLC; Physician Partners of America, LLC; Rx Care Four, LLC, d/b/a Benzer Pharmacy 116; and Benzer Pharmacy Holding, LLC.  As described more fully below, this action arises from: (1) the knowing submission and causing the submission of false or fraudulent claims to Medicare Part C and Medicare Part D for payment; (2) the knowing making, using, and causing to be made and used, false records or statements material to false claims submitted or caused to be submitted by the Defendants; and (3) conspiracy to submit false claims to Medicare, all in violation of the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended (the "Act").

2.      Relator brings this action for violations of 31 U.S.C. § 3729, *et seq.*, on behalf of herself and the United States Government and its agency, the United States Department of Health and Human Services ("HHS"), Centers for Medicare and Medicaid Services ("CMS" and/or "Medicare"), pursuant to 31 U.S.C. § 3730(b)(1).  This case against the Defendants concerns the prior and continued execution of a scheme to defraud the Medicare program principally through the submission of false claims to Medicare Part C and Part D for medically unnecessary prescriptions for kaléo's prescription drug Evzio; as well as the use of false statements and documents to obtain favorable pre-authorization and/or coverage determinations for the prescription drug claims.

3.      As required under the False Claims Act, 31 U.S.C. § 3730(b)(2), the Relator has provided the Government a statement of substantially all material evidence and information related to this complaint currently in Relator's possession.

2

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1345, and 31 U.S.C. § 3732, which specifically confer jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

5.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), which provides that, "[a]ny action under section 3730 may be brought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant can be found, resides, transacts business or in which any act proscribed by section 3729 occurred." *Id.* Section 3732(a) also authorizes nationwide service of process.  During the relevant period, one or more of the Defendants resided in and/or transacted business in the District of Massachusetts.

6.     Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because one or more of the Defendants can be found in, resides in, and/ or transacts business within this district.

## PARTIES

7.     Relator Rebecca Socol is a former employee of kaléo, Inc., and a resident of the State of Florida. The scheme alleged herein was personally witnessed by Relator during her employment as a marketing representative with kaléo, Inc.  Relator was employed with kaléo, Inc., from August 2015 through in or around October 2017, when she was the target of a retaliatory termination of her employment after repeatedly complaining about the improper conduct that is the subject of this Complaint.

8.     The United States of America is named as a Plaintiff because funds of the United States of America were and are being paid to the Defendants as a result of the false claims scheme alleged in this Complaint.

9.      Kaléo, Inc. (hereinafter kaléo), is a Virginia corporation and maintains its headquarters and principal place of business in Richmond, Virginia.  Kaléo is a pharmaceutical manufacturer.  Kaléo employed marketing representatives within the District of Massachusetts and actively marketed its prescription drug products in the District of Massachusetts.

10.     Asembia, LLC is a New Jersey company that operates as a pharmacy and as a pharmacy hub administrator, and was an integral part of kaléo's pharmacy network.  Asembia handled and processed prescriptions on behalf of kaléo that were generated within the District of Massachusetts and elsewhere.  Asembia worked closely with kaléo to carry out the scheme described in this complaint, and kaléo's management team worked alongside of Asembia management to carry out the scheme described in this complaint.

11.     MedEx Health Group, LLC, d/b/a Royal Care Pharmacy, is a Virginia company that operates as a pharmacy, and was part of kaléo's pharmacy network.

12.     Berkley Pharmacy, LLC, is a Michigan company that operates as a pharmacy, and was part of kaléo's pharmacy network.

13.     Solera Specialty Pharmacy, LLC, is a Florida company that operates as a pharmacy, and was part of kaléo's pharmacy network.

14.     Star Discount Pharmacy, Inc., is an Alabama corporation that operates as a pharmacy, and was part of kaléo's pharmacy network.

15.     EHT Pharmacy, LLC, d/b/a Curexa, is a New Jersey company that operates as a pharmacy, and was part of kaléo's pharmacy network.

16.     Successware, LLC, d/b/a The Pharmacie, is a Utah company that operates as a pharmacy, and was part of kaléo's pharmacy network.

17.     Plymouth Towne Care Pharmacy, Inc., d/b/a People's Drug Store, is an Indiana company that operates as a pharmacy, and was part of kaléo's pharmacy network.

18.     Avella, LLC; is an Arizona company that operates as a pharmacy, and was part of kaléo's pharmacy network.

19.     Giant Genie Pharmacy, LLC, is a North Carolina company that operates as a pharmacy, and was part of kaléo's pharmacy network.

20.     Patient Rx Solutions Pharmacy, LLC, is a Florida foreign limited liability company that operates as a pharmacy, and was part of kaléo's pharmacy network.

21.     Physician Partners of America, LLC (hereinafter "PPOA"), is a Florida foreign limited liability company that provides pain management through its affiliates, Florida Pain Relief Group and Texas Pain Relief Group, and whose physicians prescribed kaléo's drug Evzio. Patient Rx Solutions Pharmacy is affiliated with PPAO through common ownership.

22.     Rx Care Four, LLC, d/b/a Benzer Pharmacy 116, is a Florida company that operates as a pharmacy, and was part of kaléo's pharmacy network.  Rx Care Four, LLC, is a Benzer Pharmacy franchise.

23.     Benzer Pharmacy Holding, LLC, is a Florida company that manages Benzer Pharmacy franchises, including Rx Care Four, LLC.

24.     Asembia, LLC, MedEx Health Group, LLC, d/b/a Royal Care Pharmacy, Berkley Pharmacy, LLC, Solera Specialty Pharmacy, LLC, Star Discount Pharmacy, Inc., EHT Pharmacy, LLC, d/b/a Curexa; Successware, LLC, d/b/a The Pharmacie; Plymouth Towne Care Pharmacy, Inc., d/b/a People's Drug Store; Avella, LLC; Giant Genie Pharmacy, LLC; Patient Rx Solutions Pharmacy, LLC; Rx Care Four, LLC, d/b/a Benzer Pharmacy 116; and Benzer Pharmacy Holding, LLC, are hereinafter collectively referred to as the Pharmacy Defendants.

## GENERAL ALLEGATIONS

### A. THE SCHEME

25.     This case concerns the actions of kaléo in causing the submission of numerous false claims by pharmacies, including the Pharmacy Defendants, to Medicare Part C and Part D for medically unnecessary prescriptions for kaléo's prescription drug Evzio; as well as the Pharmacy Defendants' use of materially false statements and documents to obtain favorable pre-authorization and/or coverage determinations for the Evzio claims.   This case also concerns kaléo's use of kickbacks to pharmacies and physicians in order to obtain prescriptions for Evzio and to incentivize pharmacies to fraudulently fill prescriptions for Evzio.

26.     Evzio is the brand name for an injectable form of naloxone hydrochloride manufactured and marketed by kaléo which is used on an emergent basis in the case of an overdose of opioids.

27.     Evzio is one of several naloxone products on the market, and it differentiates itself through its method of administration, which is in the form of an automated injection unit that provides verbal instructions to the person administering the product to an impaired or unconscious overdose patient.

28.     Evzio is also differentiated from the other naloxone products on the market due to its _dramatically_ higher price of approximately $4,500 per package.[1]   Evzio was previously marketed by kaléo at a price of $690 per package starting in 2014, but beginning in early 2017, kaléo increased the list price of Evzio to $4,500.

29.      kaléo increased the price of Evzio, in substantial part, to increase profits from Medicare because the Medicare program is one of the few health insurance payers that covered

---

[1] Each Evzio dispensing package contains two injection units, and one inert training unit.

Evzio, and because Medicare is precluded by law from negotiating prescription drug prices with drug manufacturers.

30.     The price increase to $4,500 per package, which was not justifiable for any other reason beyond significantly increasing the profits from sales to Medicare beneficiaries, has resulted in a substantial windfall to kaléo and the Pharmacy Defendants at the expense of the Medicare program.  Kaléo profited from the price increase of Evzio by increasing the profits from each sale of Evzio to a pharmacy, and the Pharmacy Defendants benefitted from the price increase due to the greater profit margin that came about between their acquisition cost and the price that Medicare reimbursed for Evzio after kaléo increased the list price.

31.     After dramatically raising the price of Evzio, most of the commercial insurers that had previously covered Evzio ceased including Evzio in their drug formularies, or limited reimbursement and/or increased the co-pay requirements, which resulted in lost sales for kaléo.  In order to prop up sales among commercial insurance patients, kaléo instituted a subsidy program to cover commercial insurance co-payments for patients, or kaléo "bought-down" the cost of Evzio for pharmacies participating in kaléo's pharmacy network.

32.     In order to make up for the lost profits from reduced numbers of commercial insurance sales, as well as the cost of the commercial insurance subsidies, kaléo focused its marketing efforts on increasing Medicare beneficiary prescriptions.  Kaléo's scheme to increase the number of Evzio prescriptions for Medicare beneficiaries resulted in numerous claims being submitted to Medicare Part C and Part D for medically unnecessary prescriptions.

33.     More specifically, in order to generate more prescriptions for Evzio among Medicare beneficiaries, kaléo management devised a plan to use its marketing representatives to mislead or otherwise encourage physicians: 1) to order Evzio for patients that were at very low

risk of overdosing on opioids, thus not meeting Medicare's medical necessity coverage requirements; 2) to order Evzio in quantities that exceeded prescribing guidelines, as well as patients' need, rendering the prescriptions medically unnecessary; 3) to order Evzio not in connection with an anticipated overdose by the Medicare beneficiary, but for the beneficiary's family to have on hand in the event a *family member* overdosed on the opioids prescribed to the Medicare beneficiary, a purpose not covered or contemplated as medically necessary by Medicare; and 4) to authorize early refills of Evzio well before the expiration date of the drug, which resulted in excessive and medically unnecessary claims to Medicare.

34.     To facilitate the ordering of medically unnecessary claims to Medicare, kaléo had its marketing reps "educate" and encourage physicians (and physician office staff) to order 2 or 3 *packages* of Evzio per prescription instead of the recommended and *potentially* medically justifiable 1 package. Each *package* of the current version of Evzio contains 2 *auto-injector units* containing 2mg each of naloxone hydrochloride, which provides a sufficient amount of naloxone to reverse the effects of all but the most severe opioid overdoses on an emergent basis pending the arrival of first responders.[2] Thus, the only patients for which medically necessity *might* exist for 2 packages of Evzio are patients who are known abusers of opioids, as the contents of 1 package of Evzio (containing two injectors) are adequate for all but the most severe overdoses, such as opioid overdoses experienced by heroin addicts and addicts experiencing overdoses of fentanyl or illicit fentanyl analogs.

35.     The vast majority of Medicare beneficiaries being prescribed opioids for pain management do not meet the criteria for even a single package of Evzio since most Medicare

---

[2] The current 2mg version of Evzio replaced the previous .4mg version, and thus the current version contains 5 times the amount of the drug.

beneficiaries are elderly patients with no history of drug abuse, are being prescribed lower risk drugs, are medically compliant with their treatment regimens, and thus are at very low risk of overdose. Far fewer would meet the requirement for more than 1 package of Evzio, particularly after the dosage was increased to 2mg. Thus, kalèo's successful "education" and encouragement of physicians (and in some cases the physicians' staff without the physicians' knowledge) to order 2 or 3 packages of Evzio (at a cost of $4,500 *per package*), resulted in a substantial increase in costs to Medicare for medically unnecessary Evzio prescriptions. Said simply, providing even a single package of Evzio to medically compliant Medicare beneficiaries on treatment regimens of codeine, hydrocodone or even oxycodone, who have no history of drug abuse, and who are thus at a low risk of overdose, cannot be medically justified, nor is it consistent with accepted prescribing recommendations for Evzio.[3] Providing two or three packages of Evzio to such a patient is well beyond the pale.[4]

36.     Kaléo also had their marketing reps "educate" and otherwise encourage physicians to order 2 refills of Evzio of the prescription even though there is no need for refills prior to the product expiration date or absent the patient using the product – which would have been in the event of an overdose – at which time the patient could have received another prescription from their treatment provider. Evzio has a product shelf life of 2 years, so there is no need for early anticipatory refills of the drug. Thus, the refills, which were facilitated by the kaléo network

---

[3] The medical compliance of many Medicare beneficiaries on pain management regimens is confirmed through the use of urine toxicology screens by their treating physicians, and is documented in their patient files.

[4] There is a telling inconsistency in kaléo's actions with respect to its subsidy program for patients with commercial insurance whereby kaléo provided a 100% co-pay subsidy or free product – that being, for these patients who are often younger and known drug addicts and at a higher risk of overdose, kaléo will generally only subsidize or provide one Evzio *unit*, not even one *package* containing two units. Yet, for low risk Medicare patients, kaléo pushes for the prescribing of 2 or more packages (4 or more units) of Evzio.

pharmacies initiating the early refills, resulted in a waste of the drugs and the Medicare funds used to purchase them.

37.     Another aspect of the excessive refill portion of the scheme involved kaléo instructing marketing reps to convince physicians beginning in January 2017 to issue new prescriptions for Medicare beneficiaries for the newly released 2mg version of Evzio even though the patients were already in possession of unexpired .4mg versions of the drugs that were still viable and usable.

38.     A principal aspect of the scheme to generate medically unnecessary Evzio prescriptions involved kaléo marketing reps convincing physicians to issue blanket standing orders for all their Medicare patients receiving opioid pain management treatment, and then having the physicians provide patient lists and patient contact information for those patients to pharmacies in the kaléo pharmacy network to process the prescriptions orders.  To facilitate the standing order plan, kaléo would have their marketing reps engage in what were referred to as "activation days" wherein the marketing reps would spend an extended period of time at the physicians' offices facilitating the sharing of patient data with the kaléo network pharmacies, including the Defendant Pharmacies.

39.     Although it was kaléo's "official guidance" that the marketing reps were not supposed to personally access patient data, it was understood that this not only occurred, but that it was often necessary in order to facilitate the effectuation of the blanket standing orders.  Indeed, at kaléo training programs, "successful" marketing reps would speak and state that in order to be successful, kaléo marketing reps should plan on spending the entire day at the physicians' offices on "activation days" in order to ensure that the standing orders were implemented and the information was shared with the pharmacies, and to do what was necessary to bring that about.

10

Thus, the marketing reps' assistance to physician offices on "activation days" often involved violations of the HIPAA privacy rules by having the marketing reps improperly access confidential patient data, and in many cases, it also constituted a prohibited kickback by having the kaléo marketing reps supplementing and assisting the physician's office staff with their duties.

40.     The pharmacies in question, including the Pharmacy Defendants, were part of a nationwide pharmacy network that kaléo established to provide monetary incentives to pharmacies that would facilitate kaléo's commercial insurance subsidy program, and to facilitate the pre-approval of claims submitted to Medicare Part C and Part D – where required by the particular plan – as well as to dispense the drug and to submit the claims to Medicare.  In the case of the blanket standing order facet of the scheme, the pharmacies would contact the patients to inform them that their physician had ordered Evzio, the pharmacies would then obtain pre-approvals when required, dispense the drugs, and then submit the claims to Medicare.  Due to the relatively high profit margins involved in dispensing Evzio as a result of the price increase, pharmacies, including the Pharmacy Defendants, had a strong financial incentive to fraudulently obtain Medicare pre-authorization and coverage approvals, as well as to participate in the blanket standing order part of the scheme.

41.     In connection with the pre-approvals, CMS and various Medicare Part C plans established specific coverage criteria (in addition to the standard requirement of medical necessity) for Evzio.  For instance, some plans required that the patient be visually impaired in order for the claim to be approved instead of the much less expensive alternative naloxone drugs, whereas others required medical justification that the patient could not otherwise use the much less expensive alternative naloxone products, that the patient carried a particular diagnosis, or that the patient had a history of drug abuse or overdose.  Because, however, very few Medicare beneficiaries actually

met the specific coverage criteria, certain of the filling pharmacies – and specifically the Pharmacy Defendants – would provide false information to Medicare Part C and Part D in order to fraudulently obtain pre-approval and favorable coverage determinations for the Evzio claims.

42.     With respect to PPOA, certain of its pain management physicians held an ownership interest in Patient Rx Solutions, LLC.  Initially, the practice physicians refused to prescribe Evzio, and they continued to refuse to do so until kaléo agreed to include Patient Rx Solutions, LLC in the kaléo pharmacy network.  Once kaléo agreed to include the pharmacy in the network, then the PPOA physicians began to prescribe Evzio as part of their treatment protocol. In other words, the pain management physicians at PPOA refused to prescribe Evzio until Patient Rx Solutions, LLC was included in kaléo's pharmacy network, which in turn allowed the physicians (through the ownership in the pharmacy) to profit from each Evzio prescription that they authorized.  Kaléo's agreement to include Patient Rx Solutions, LLC in kaléo pharmacy network in order to secure Evzio prescriptions from the PPOA physicians constituted an illegal kickback.

43.     The Relator has personal knowledge of the scheme as a result of her former position as a marketing representative at kaléo.  The Relator also has personal knowledge of the scheme, including the actual submission of claims to Medicare, as a result of her interaction with several of the Pharmacy Defendants who submitted the claims to Medicare, as well as other kaléo marketing reps who relayed to her their interactions with other of the Pharmacy Defendants.

44.     During the latter part of her employment with kaléo, Relator complained to kaléo senior management about the price increase of Evzio, and the resulting loss of coverage for many commercial insurance patients.  In response, Relator was informed by senior management that

kaléo was making up for the lost commercial sales through the increased revenue from Medicare beneficiary sales.

45.     Relator also complained to several members of kaléo's senior management about kaléo's marketing plan for Evzio as it applied to Medicare beneficiaries, and the fact that it resulted in the submission of medically unnecessary claims.  In response, Relator was told to "be positive," and that other marketing reps looked to her for inspiration and guidance. When Relator persisted in her complaints about kaléo's marketing leading to the submission of medically unnecessary claims to Medicare, she was subjected to a retaliatory termination of her employment at kaléo.

46.     During the latter part of Relator's employment at kaléo, she inquired of several of the Pharmacy Defendants, as well as of other marketing reps, as to how the pharmacies were able obtain    Medicare    coverage    for    Evzio    given    the    pre-authorization/coverage requirements/limitations.  When she inquired of one of the Pharmacy Defendants, she was told that information was "proprietary;" and with respect to others she inquired about, she was told that they simply make up the necessary information. A pharmacy technician at one of the Pharmacy Defendants that successfully obtained Medicare coverage told Relator that it was often impossible to legitimately meet the Medicare coverage criteria.  With respect to one of the Pharmacy Defendants, Relator was told they claim the patient is blind in order to secure coverage.  Another kaléo rep informed Relator that the information one of the Pharmacy Defendants put on the Medicare pre-authorization forms was inaccurate, and described the information as "bullshit."

47.     The above described scheme was carried out through the combined and concerted efforts of kaléo, the Pharmacy Defendants and the PPOA physicians, as part of a conspiratorial agreement(s) to generate and submit the false claims to Medicare for the mutual financial benefit of kaléo, the Pharmacy Defendants and PPOA.

13

48.     As a result of the above described scheme, the Defendants have engaged in a conspiracy, scheme and pattern of misconduct that has resulted in the submission of numerous false claims and false statements to the United States, and the resulting receipt and retention of Medicare funds that they were not entitled to receive and retain.

**B.  MEDICARE AND REIMBURSEMENT**

49.     Medicare is a federally-funded health insurance program for the elderly and the disabled.  Medicare was created in 1965 in Title XVIII of the Social Security Act and is codified at 42 U.S.C. § 301 *et seq.*  Medicare is administered by CMS and is funded through HHS. Prescription drug coverage is principally provided to Medicare beneficiaries through either Medicare Part C or Part D.  Medicare Part C, also referred to as Medicare Advantage, is a Medicare coverage option funded by Medicare, but administered by private insurance companies, that provides hospitalization, outpatient care and prescription drug coverage to Medicare beneficiaries in a managed care model.  Medicare Part D, which is also funded by Medicare, provides prescription drug coverage to Medicare beneficiaries that choose to remain in the traditional Medicare Part A and Part B plans for inpatient and outpatient care.

50.     Claims submitted to Medicare for reimbursement must satisfy the requirements of the Social Security Act, as well as applicable regulations, procedures, and instructions.  Providers participating in Medicare are required to familiarize themselves with all applicable laws, regulations, procedures, and instructions and to certify on each claim that it is being submitted in full compliance with governing law, including the medical necessity of the services for which claims are submitted.  Federal regulations also require providers to furnish CMS, through its intermediaries, all information necessary to assure proper payment under the Medicare program.

51.     Generally, no payments may be made under the Medicare program for expenses incurred for items and services, including drugs, that are not "reasonable and necessary" for the diagnosis and treatment of an illness or injury. *See* 42 U.S.C. §1395y(a)(1)(A).

52.     Pharmacies and other healthcare providers who participate in the Medicare program, as well as other federal healthcare programs, are required to enter into contracts or "provider agreements" with HHS. Under the terms of these provider agreements, physicians and other participating healthcare providers certify that they will comply with all laws, regulations, and guidance concerning proper practices for Medicare providers. Compliance with these provider agreements is both a material condition for participating in, and a material condition of receiving payments from, the Medicare program.

### C. **THE FALSE CLAIMS ACT**

53.     The False Claims Act ("FCA") provides, in part, that any person or entity that knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval is liable to the United States for damages and penalties. *See* 31 U.S.C. § 3729(a)(1)(A).

54.     The FCA also provides, in part, that any person or entity that knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim is liable to the United States for damages and penalties. *See* 31 U.S.C. § 3729(a)(1)(B).

55.     The FCA also provides, in part, that any person or entity that conspires to commit as violation of 31 U.S.C. § 3729(a)(1)(A)(B) or (G), is liable to the United States for damages and penalties. See 31 U.S.C. § 3729(a)(1)(C).

56.     To show that a person or entity acted "knowingly" under the False Claims Act, the United States must prove that the person or entity, with respect to information: (1) had actual knowledge of the information; (2) acted in deliberate ignorance of the truth or falsity of the

information; or (3) acted in reckless disregard of the truth or falsity of the information. The United States does not have to prove that the entity had the specific intent to defraud the United States. *See* 31 U.S.C. § 3729(b)(1).

57.     The Medicare and Medicaid Fraud and Abuse Act (the "Anti-Kickback Statute" or "AKS"), 42 U.S.C. §1320a-7b, prohibits the offering or paying of any remuneration, directly or indirectly, in cash or in kind, to induce the recipient to order or to arrange for the ordering of any good or service for which payment might be made in whole or in part under any federal healthcare program.

58.     As part of healthcare legislation enacted in 2010, the AKS was amended to clarify that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." *See* Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148 § 6402(f), 124 Stat. 119, 759. Hence, any claim for payment resulting from a violation of the AKS is deemed to be a *per se* and material violation of the FCA.

59.     As healthcare providers that seek and accept Medicare reimbursement, the Pharmacy Defendants and PPOA physicians are obligated to be knowledgeable of and to comply with all applicable statutes, regulations, and guidelines.  Indeed, in connection with each of the Pharmacy Defendants' and PPOA physician's enrollment into the Medicare Program, each certifies that they are familiar with and will comply with all applicable statutes, regulations, and guidelines.  Moreover, with respect to each claim submitted for payment to the Medicare Program, the Pharmacy Defendants separately certify that the claims being submitted are for medically necessary services.

60.     The FCA provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the Government for payment or approval is liable for a

civil penalty for each such claim submitted or paid, plus three times the amount of the false claims submitted to the Government.  The FCA allows any person having information regarding a false or fraudulent claim against the Government to bring an action for him or herself (the "Relator") and for the Government and to share in any recovery.

61.     Based on these provisions, the Relator in this case seeks to recover damages and civil penalties arising from the Defendants' actions in presenting or causing to be presented false claims, false records and false statements to the United States Government and its agents in connection with Pharmacy Defendants' claims for reimbursement for non-reimbursable Evzio provided to beneficiaries under the Medicare program.

62.     The FCA also provides, in part, that if an employee of any such entity is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee in furtherance of a FCA action or efforts to stop violations of the FCA, that employee has a cause of action against his employer for damages.  *See* 31 U.S.C. § 3730(h).

63.     The Florida Private Whistleblower Act, Fla. Stat. § 448.102, makes it unlawful for an employer to "take any retaliatory personnel action against an employee because the employee has," among other things, "objected to, or refused to participate in, any activity, policy or practice of the employer which is in violation of a law, rule, or regulation." Pursuant to Fla. Stat. §448.103, an employee that has been retaliated against has a civil cause of action against the employer for damages.

64.     Pursuant to these anti-retaliation provisions, Relator also seeks to recover damages resulting from kaléo's retaliatory actions in response to her objections to and complaints about

17

kaléo's actions that were violating and causing violations of laws, rules and regulations, including the False Claims Act.

**Count I**
**Violation of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(A)**
**False Claims**

65.     Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 64 of this Complaint.

66.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

67.     Through the acts described above and otherwise, Defendants and their agents and employees knowingly (or with reckless disregard to the truth or falsity thereof) submitted or caused to be submitted false claims to Medicare for payment by the United States from at least 2015 to present.

68.     The United States, Medicare, and its fiscal intermediaries and contractors, unaware of the falsity of the records, statements, and claims made or submitted by Defendants and their agents and employees, paid the Defendants for claims that would not be paid if the truth were known.

69.     By reason of the Defendants' false records, statements, claims, and/or omissions, the United States and the Medicare program have been damaged.

Thus, Defendants violated the False Claims Act, in that they knowingly presented and caused to be presented false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

**Count II**
**Violation of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**
**False Statements**

70.     Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 64 of this Complaint.

71.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

72.     Through the acts described above and otherwise, Defendants and their agents and employees knowingly (or at least with reckless disregard to the truth or falsity thereof) made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States since at least 2015.

73.     The United States, Medicare, and its fiscal intermediaries and contractors, unaware of the falsity of the records, statements, and claims made or submitted by Defendants and their agents and employees, paid the Defendants for claims that would not be paid if the truth were known.

74.     By reason of the Defendants' false records, statements, claims, and/or omissions, the United States and the Medicare program have been damaged.

Thus, Defendants violated the False Claims Act, in violation of 31 U.S.C. § 3729(a)(1)(B).

**Count III**
**Conspiracy to Violate the False Claims Act**
**31  U.S.C. § 3729(a)(1)(C)**

75.     Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 64 of this Complaint.

76.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

19

77.     Through the acts described above and otherwise, kaléo, Inc., the Pharmacy Defendants, and PPOA and their agents and employees conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and (B) by agreeing to, and then knowingly (or with reckless disregard to the truth or falsity thereof) submitting or causing to be submitted false claims to Medicare for payment by the United States from at least 2015 to present; and knowingly (or at least with reckless disregard to the truth or falsity thereof) making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States since at least 2015, in violation of the False Claims Act.

78.     By reason of the Defendants' agreement to violate 31 U.S.C. §§ 3729(a)(1)(A) and (B), and Defendants' actions to violate 31 U.S.C. §§ 3729(a)(1)(A) and (B), the United States and the Medicare program have been damaged.

Thus, Defendants conspired to violate the False Claims Act, in violation of 31 U.S.C. § 3729(a)(1)(C).

### Count IV
### Whistleblower Retaliation
### 31 U.S.C. § 3730(h)

79.     Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 64 of this Complaint.

80.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3730(h).

81.     Through the acts described above and otherwise, kaléo, Inc., and their agents and employees discriminated against Relator in the terms and conditions of her employment because of lawful acts done by Relator in furtherance of her efforts to stop violations of the FCA, including the termination of Relator's employment at kaléo, Inc.

20

82.     By reason of the Defendant's actions, the Relator has been damaged.

Thus, kaléo, Inc., violated the False Claims Act, in violation of 31 U.S.C. § 3730(h).

**Count V**
**Violation of the Florida Private Whistleblower Act**
**Fla. Stat. § 448.101 *et seq.***
**Retaliatory Discharge**

83.     Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 64 of this Complaint.

84.     This is a claim for damages against kaléo, Inc., for retaliatory discharge in violation of the Florida Private Whistleblower Act, Fla. Stat. § 448.101 *et seq.*

85.     During the course of her employment with kaléo, Relator became aware of and informed management at kaléo, verbally and in writing, of violations of laws, rules and regulations by kaléo with respect to the marketing of Evzio.

86.     As a result of those complaints, Relator suffered retaliatory personnel action, including initiation of a retaliatory investigation, and ultimately, termination of her employment.

87.     By reason of kaléo's retaliatory actions, Relator has been damaged.

88.     Pursuant to Florida Statutes §§ 448.101-448.105, Relator is entitled to recover her lost wages, including interest and costs, other damages allowable by law, including injunctive relief, and expenses, costs and attorneys' fees in bringing this action.

Thus, kaléo, Inc., violated the Florida Private Whistleblower Act, Fla. Stat. § 448.101 *et seq.*

**Prayer for Relief**

WHEREFORE, Plaintiff/Relator prays for judgment against defendants as follows:

i.     That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

ii.     That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions, as well as a civil penalty against each defendant for each violation of 31 U.S.C. § 3729;

iii.    That the Relator be awarded the maximum amount allowed pursuant to § 3730(d) and (h) of the Civil False Claims Act;

iv.     That the Relator be awarded damages, injunctive and other equitable relief to remedy the harm resulting from the retaliatory action kaléo, Inc., took against Relator for objecting to violations of the False Claims Act, the Florida Private Whistleblower Act, and other laws, rules and regulations;

v.      That the Relator be awarded all costs and expenses of this action, including attorneys' fees; and

vi.     That the United States and the Relator receive all such other relief as the Court deems just and proper.

**Jury Demand**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff/Relator hereby demands trial by jury.

DATED: August 6, 2018.

Respectfully submitted,

Nicholson & Eastin, LLP

Robert N. Nicholson, P.A.
Florida Bar No. 933996
Robert@NicholsonEastin.com
Nicholson & Eastin, LLP
707 N.E. Third Avenue, Suite 301
Fort Lauderdale, Florida 33304
Telephone: (954) 634-4400
Facsimile: (954) 634-4418
Counsel for Relator

Paul W. Shaw, Esq.
Massachusetts Bar No. 455500
Verrill Dana, LLP
One Boston Place
Suite 1600
Boston, MA 02108
Telephone: (617) 274-2860
Facsimile: (617) 309-2601
Local Counsel for Relator